Grimstad v. Morgan Stanley Smith Barney, LLC. It's long, but pronounceable. Good morning. Mr. Jones. Easy time with my name, right? May it please the Court, William Jones and Michael Crane on behalf of the plaintiff, Carrie Milligan, and she goes by just Milligan now, make it even easier. Ms. Milligan's 11-year career at Morgan Stanley ended in September of 2012. The question this case poses is whether a reasonable jury could conclude that her gender caused her termination. The answer is yes. There are three separate categories of evidence that we think allow Ms. Milligan to a trial. Let me talk about the first one, and that is the stated reason for her termination. So after she was fired and we sued, we sent them in in rogatories and we said, why did you fire Ms. Milligan? And they said, well, because she was involved in a wire transfer, and that violated policy. So we did discovery and we found out that there were other wire transfers because apparently this is something that happens a lot in the industry. And the most provocative one is something we learned in August of 2015, almost at the end of discovery, shortly before the deposition of Mr. Evans, and that's a guy named Avipul Shah. So he was involved in a $500,000 wire transfer, and the facts are indistinguishable in any material way with the Milligan wire transfer. So that fact by itself. Well, counsel, that's what you say. The brokerage says that they are very different for our purposes. The question then becomes, what evidence do you have that they are lying when saying that for our purposes these are completely different problems? Well, there are several. The first is they say the wire transfer itself violated the rules on discretionary trading. And so we look at that and we say, well, let's look at the facts. And so what they said is that Ms. Milligan received an e-mail from the husband. Well, that isn't what happened. She got an e-mail from the client, Mary Jo. The husband was on the e-mail as well, and she had dealt with Mary Jo, the client, through the very same e-mail address throughout her entire tenure at Morgan Stanley. My question may not have been clear. Much of your presentation is essentially that the brokerage is making a mistake and that a well-run brokerage would not have distinguished these situations from the ones you've named as comparatives. But the court keeps saying we don't use the employment discrimination laws to prevent employers from making mistakes. Once the employer offers a reason, the question is whether that reason is a pretext for discrimination, which boils down to the question whether it's a lie, whether they are misrepresenting their own thinking. And so the question I'm trying to get you to address is what reasons do we have, what reasons do you have to contend that they are misrepresenting, that Evans is lying about his own thought processes? Three. One is that they said that Milligan processed a wire transfer request by an unauthorized third party purporting to be acting on behalf of the client. That's not what happened. The e-mail came from the client, so that's a false statement. Does everything boil down to we think they're making a mistake, and therefore they're lying? No, they said something affirmatively untrue. They said that she took the e-mail request from the husband. She didn't. The e-mail came from the wife, Mary Jo. That's a false statement. We've got a lot of cases. It is not a false statement to say X if you believe it to be true. It's terribly important to distinguish between a lie, an intentional falsehood, and something that the plaintiff says, well, we can show that this belief was not correct, because the latter gets into questions of personnel management. That's why I'm asking you if you have any way of distinguishing errors from lies in this case. Yeah, but the first statement that she took the e-mail request from the husband is patently false. If you look at the e-mails themselves, the e-mail came from the wife. I give up. That's a false statement. I don't know. I'm sorry, Your Honor. I'm missing you, but they said that the e-mail came from the wife. I think you are misunderstanding the problem. Okay. Well, the first false statement is they said that she took the e-mail request from the husband, and that's not what happened. The e-mails themselves reflect that isn't what happened, so I believe that's a lie. Then they said she violated the policy on discretionary trading. She didn't. And if she did, V. Poole shot at the exact same thing. Then they said that she violated a different policy that they came up with during the case, and that is the policy on wire transfers that they say is reflected in the wire fraud fact sheet. The wire fraud fact sheet doesn't say that. It doesn't say that you have to talk to the client. It says you have to have an out-of-band confirmation, and that's what she did. So I believe, Your Honor, those are three separate things that they said that are demonstrably false, and that by itself gives us a right to have a trial, to present these facts to the jury. And the disparate treatment between her and V. Poole Shaw is also by itself sufficient to allow this case to go to a jury. What he did was not different in any material respect. They both were the victims of hacked e-mail. They both spoke to somebody who duped them into participating in this wire. They wanted to retreat to disciplinary records, and that doesn't help either because V. Poole Shaw had a much more serious disciplinary history than Milligan did. So that's the disparate treatment with respect to Shaw. There are others. So even if they had shown that she violated the rules on discretionary trading, I don't think she did, there are at least three other comparators, three other male financial advisors, who were found to have violated discretionary trading rules and were not disciplined at all. If you talk about, you know, Mr. Evans admitted there's no three-strikes rule. There are no guidelines on how severe an infraction has to be before somebody is disciplined. There are no rules on how many will cause somebody to be disciplined. But there's a laundry list in the brief of other male financial advisors who had very, very severe disciplinary histories, and they were not disciplined or they were not terminated. They wanted to use Patrick Lauderdale as their comparator. It wasn't our comparator. It was theirs because he was also involved in a wire transfer that turned out to be fraudulent. The wire transfer was distinguishable there. He said just do it after receiving an e-mail request. But he had already been on heightened supervision long before this ever happened, where he had far more than three disciplinary events on his record, and he was not terminated by Mr. Evans. So apart from the disparate treatment, I think that that by itself is sufficient to allow us to have a trial. But apart from that, the shifting stories and the lies, I think, are sufficient to entitle us to a jury trial. They told different stories about who made the decision to fire Milligan. They now say Evans made the decision. But during the six weeks in between when the wire transfer came to light and when the decision was announced to Ms. Milligan, Evans was telling Milligan, no, it's not my decision. It's up to the lawyers. They made misstatements to FINRA. They made misstatements to the EEOC concerning the wire transfer. They said it came from the husband and it didn't. It came from Mary Jo herself, or at least that's how it appeared from the e-mail. Evans said, Moyong, the direct supervisor, Evans was a complex manager and Moyong was the direct supervisor. Evans said Moyong was pushing me to fire her. I asked Moyong, what was your position on that? He said, I didn't say anything. I didn't have any position on that. We asked him in interrogatories, why did you fire her? They said it was a wire transfer and the violation of discretionary trading rules. And then they changed their story when it became clear that she didn't violate discretionary trading rules. And then they said it was a wire fraud fact sheet. They swore in their answers to interrogatories that other than Lauderdale, nobody else had been involved in a fraudulent wire transfer in the Chicago complex. That was false. We learned that when the Shaw information came to light. So the shifting stories themselves are also sufficient to entitle us to a jury trial. And we refer to it, the case law refers to it as cat's paw theory. I think it's more appropriate just to talk about this in terms of proximate cause. But Mr. Mitchell had expressed his biases. He wasn't shy about them. He harassed Milligan and he also was telling Milligan that you're about to have children. Don't have children. Have them when I'm around, not when I'm in Arizona. And we have three separate witnesses who say that he made those statements to them after Milligan was terminated. And he denied those, of course. And then we have the six-week period in which there was no decision on what discipline she would receive, if any, as a result of this wire transfer. And in the interim, Mitchell testified, I was talking to Mr. Evans. And they had a long talk to Mr. Evans and Mr. Muyong about bringing other financial analysts into this relationship. And Mr. Mitchell talked in terms of, you know, we spoke with Mr. Evans and Mr. Muyong about bringing Brenza in. Well, there was a meeting five days before she was fired where Mr. Brenza made a comment about her, about she was about to have a family and she was going to have kids. And Ms. Milligan made it clear after that meeting she was not going to partner with David Brenza. Five days later, she was fired. The timing is suspicious as well, six weeks. If Mr. Evans testified, I learned everything I knew about her employment history and this wire transfer within days of when it happened. It took him six weeks to terminate her, five days after she announced she wouldn't partner with Dave Brenza. Each of those facts, the shifting stories and the lies, are sufficient to entitle us to a jury trial. Put them all together and there should be no doubt that we're entitled to a jury trial. And the court also instructs under Ortiz that in addition to the evidence, all of the evidence being something the court has to look at, the McDonnell-Douglas burden shifting method still applies. And applying that, she's a member of a protected class. She was terminated. Other people were treated differently in the face of the same facts. And that, too, entitles us to a jury trial. The district court didn't apply the proper standard. It drew inferences in favor of the defendants. It got the facts wrong in several instances, which we outlined in the brief. And all of those factors weigh in favor of a jury trial. On the harassment claim, Ms. Milligan was subjected to come-ons, offensive comments, throughout her entire tenure. The district court had two reasons, I think, for granting summer judgment. One is that it wasn't sufficiently hellish within the 300 days of her termination, which I think is the improper standard, and it was, and it was also pervasive. It wasn't just severe. It was also pervasive. And he said that the harassment was different because there were different people who committed it, and the Supreme Court in this court has instructed that that isn't the focus. The focus is on the conduct, not on who committed it. So I'll reserve a few minutes for rebuttal, if I may. Counsel? Ms. Cimoli. Yes. May it please the court, Bridget Chex Cimoli of Greenbrook Traurig on behalf of the appellees. Morgan Stanley Smith Barney terminated Ms. Milligan's employment because she processed a wire transfer request by an unauthorized third party. That violated firm policy. She does not deny that she took instruction from an unauthorized person and in doing so violated both firm policy and then the FINRA rules, and that's in her deposition at page 110 through 11, 120 through 21, and 124. She instead here argues, though, that gender was a factor in her termination. As the district court recognized, though, Milligan has not presented evidence that male financial advisors were treated differently or more fairly than she was. Turning to the comparator, Shah, he's not a comparator. He had no prior disciplinary history. What he did have was customer complaints. If you look at the CRD reports in the record, you'll see that customer complaints are a different category. He was also victim of a very skilled fraudster. That fraudster in that case not only had a copy of the passport, had the Social Security number of the person, and also when Shah called, the fraudster had the phone number. That's different than Lauderdale, who we in the district court believe to be the correct comparator, and looking at the district court's order, which is in the appendix at page 10, Lauderdale also processed a fraudulent transfer request like Milligan. He did so based on an email request purporting to come from the client without attempting to reach the client to confirm by authorization. Now here, Milligan received a call from the fraudster, whom she believed to be the husband of the client, and again, the husband did not have written authorization on this account, so he is not an authorized party or client. And like Milligan, Lauderdale did have discipline. Milligan had been disciplined twice prior, 2008 and 2009, and after processing the fraudulent transfer, he, like Milligan, was terminated. Not only was Milligan treated the same as male financial advisors, but there was no evidence presented that the decision maker here, the person is Mark Evans, and Mark Evans confirms that he's the decision maker at 54-8, page 22, that he terminated Milligan based on a discriminatory motive, much less engaged in improper conduct or treated Milligan unfairly as this circuit's cases require Cardozo and Davis. In fact, at her deposition, Milligan admitted that Evans did not make any comments that led her to believe that she was terminated for her gender. That's at page 222, and also stated that nor did anyone else in management, a supervisory position, legal, or human resources, and that's at page 223. Looking at the FINRA acceptance waiver and consent that Milligan did enter into, she consented to a finding by FINRA that she affected trades in a client's account on the instructions of the client's husband without the proper authorization and without receiving prior approval. Just to briefly touch on the policies that she violated, just so the court has them, and to be clear, the policies are 7.581, which is third-party agent trading authority, and as I explained to the court, the husband did not have authority to do so. It's 8.72, unauthorized discretion, and then on the wire, fraud fact sheet, which is in the record at 54-1, Exhibit 14. And both Evans in his deposition and Milligan in her own deposition stated that Morgan Stanley policies on wire transfers required that the financial advisor needed verbal confirmation on a wire transfer, and she also conceded in her deposition that she did not receive verbal confirmation from the actual client. We also state, as in our briefs, that Milligan has been unable to show any evidence that would allow for a cat's paw theory to take place here. She needed to show the supposed intent was communicated to Evans. There's no actual evidence, or as the district court found, a reasonable inference that such intent was communicated to Evans so that he could become the cat's paw. Instead, Milligan's asking this court to speculate that such messages were communicated and acted upon. The court rejected such speculation, and that termination is consistent with the law. As to Milligan's hospital work environment claim, the court found and was very specific in its findings that a majority of the claims or allegations were time barred. There was no linkage because the discrete issues of harassment were neither a single chain of conduct themselves nor linked in any way. In this court's Lucas decision, the court said that for time barred acts to be properly considered, the acts must be connected in time and circumstance, and we don't have that type of connection here. If the court has no further questions, I would rest on our brief and ask the court to affirm the district court's order. Thank you, Your Honors, very much. Thank you, Counsel. Anything further, Mr. Jones? Thank you, Your Honor. I'll be brief. On the issue of discretionary authority, I'd ask the court to please take a careful look in the record at Plaintiffs' Exhibit 68. It's at document 5420. This is the relevant portions of the account that is at issue in this case, and if you look at that, it is clear that the email request came from Mary Jo. She's the signatory in the account. She's the one who said, Carrie, please wire transfer this money. She wasn't exercising authority based upon the husband. She was exercising authority based upon the request from the wife, so she didn't violate the rules they say she violated, and they didn't talk truthfully when they said that she took the directions from the husband. She took them from the wife. Avipul Shah had seven customer complaints. Two of them were settled. One of them, the client, left the firm, and he also had a letter of education. He was treated differently, as were various other men at the firm, and so with that, unless the court has questions, I'll sit down. Thank you, counsel. The case is taken under advisement.